# IN THE UNITED STATES DISTRICT COURT IN AND FOR THE NORTHERN DISTRICT OF FLORIDA, TALLAHASSEE DIVISION

**MOON LEE**

**Plaintiff**

**v.**

**UNIVERSITY OF FLORIDA
BOARD OF TRUSTEES,**

**Defendants**

**CIVIL ACTION**

**CASE 1:22-cv-00340-MW-ZCB**

## PLAINTIFF'S RESPONSE ON OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## NON-ADMINISTRATIVELY REVIEWED ACTS OF DISCRIMINATION

1. On page 20, in footnote number 8, of Defendant's Motion for Summary Judgment filed on 08/08/24, the Defendant pointed out that the Plaintiff never filed an amended charge of discrimination to address the denial of her third promotion attempt in 2023. As such, any discrimination claim based on the denial is not properly before the Court.

2. Defendant further used Kelly v. Dun & Bradstreet, Inc., 557 Fed. Appx. 896, 899 (11th Cir. 2014) to argue that discrete acts of discrimination, which occur after the filing of an EEOC complaint must first be administratively reviewed before they may serve as a basis for a judicial finding of discriminatory conduct.

8 Plaintiff never filed an amended charge of discrimination to address the denial of her third promotion attempt in 2023. As such, any discrimination claim based on the denial is not properly before the Court. "Discrete acts of discrimination, such as termination or failure to promote, that occur after the filing of an EEOC complaint must first be administratively reviewed before they may serve as a basis for a judicial finding of discriminatory conduct." Kelly v. Dun & Bradstreet, Inc., 557 Fed. Appx. 896, 899 (11th Cir. 2014). "Each discrete discriminatory act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 113. Additionally, the claim is not properly before the court because it was not alleged in Plaintiff's operative complaint. See, e.g., Kubiak v. S.W. Cowboy, Inc., 164 F. Supp. 3d 1344, 1367 n.33 (M.D. Fla. 2016) (declining to consider on summary judgment certain adverse actions that were not alleged in plaintiff's complaint).

3. Unfortunately, after researching the mater the Plaintiff is forced to concur on both points:

a) Because the Defendant's last discrete act of discrimination against the Plaintiff was reported to the FCHR / EEOC on 1/28/2022 nothing that occurred after that date could have been administratively reviewed. *Therefore, under Kelly nothing that occurred after 1/28/2022 is, or can be properly before this court and they may not serve as a basis for a judicial finding of discriminatory conduct.*

b) While Plaintiff's original complaint included charge of discrimination to address the denial of her third promotion attempt in 2023 the Defendant's response convinced her that because the denial of her third promotion attempt in 2023 was not reported to the FCHR / EEOC no discrimination claim based on the denial could properly be placed before the Court in this case. Because research caused the plaintiff concur with the Defendant she filed an amended Complaint removing the denial of her third promotion attempt in 2023 from

the case.  *As such, any discrimination claim based on the denial of her third promotion attempt in 2023 is not and cannot be properly before the Court may not serve as a basis for a judicial finding of discriminatory conduct.*

**POINT BY POINT ANALYSIS OF THE DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**4.** In the first full paragraph on page 5 of the Defendant's motion for summary judgment defendant states**:**

a)  When asked to identify a comparator that was promoted to full professor, Plaintiff. identified two individuals, Ted Spiker and Juan-Carlos Molleda.

b)  The Defendant claims that the above stated promotion cases were much stronger than Plaintiff's.  That is a question that must be decided by a Jury**.**

5.  In the second full paragraph on page 5 of the Defendant's motion for summary judgment the Defendant admits that the Plaintiff's Step 2 grievance form, submitted on September 24, 2019, officially notified the Defendant of Plaintiff's charge of discrimination.

6.  In the first paragraph on page 6 of the Defendant's motion for summary judgment:

a)  In the paragraph directly following the one in which the Defendant admitted that on September 24, 2019, Plaintiff officially notified the Defendant of Plaintiff's charge of discrimination the Defendant claims that

the Plaintiff did not file a charge of discrimination. Sadly the Defendant does not appear to be bothered by making such a demonstrably incorrect claim.

7. In the first full paragraph on page 6 of the Defendant's motion for summary judgment defendant admits that:

a)	On January 27, 2020 an arbitration was held concerning how the Defendant handled the Plaintiff's promotion attempt.

b)	The Plaintiff won the arbitration.

c)	The Arbitrator found that the Defendant created inappropriate dossier entries and required the Defendant to remove them.

d)	The Arbitrator found that the Defendant committed various violations and ordered the Defendant to correct them.

e)	The Arbitrator found that the Defendant violated its own established criteria.

f)	The Arbitrator granted the Plaintiff the maximum relief he was permitted to grant. Unfortunately, that relief was limited to allowing the Plaintiff to reapplication for promotion retroactive to July 1, 2019.

g)	The Arbitrator was not permitted to retain control of the case to ensure that the redo was handled in a fair and impartial way.

h)	Unfortunately, the same people handled the Plaintiff's reapplication for promotion, and the negative result was a forgone conclusion.

i)  The Defendant makes the blatantly false statement that Plaintiff abandoned her discrimination claim during the Arbitration, she did not.  The Arbitration was concerned with what happened, not why it happened.

8. In the first full paragraph on page 8 of the Defendant's motion for summary judgment defendant states:

a)  There is no evidence that any UF faculty member or administrator within the College ever told Plaintiff that she would never be promoted to full professor.  *Please note that the Defendant did not deny that Plaintiff was told that she would never be promoted to full professor only that there was no evidence that proves that it happened.*

9. In the first full paragraph on page 8 of the Defendant's motion for summary judgment defendant states:

a)  That the Provost, Dr. Glover, never made such a statement.  *Again, it is worth noting that the Defendant did not deny that Plaintiff was told that she would never be promoted to full professor only that the Provost, Dr. Glover claims that he did not personally make that statement.*

10. In the last full paragraph on page 11 of the Defendant's motion for summary judgment defendant states:

a)  Plaintiff failed to satisfy, for a second consecutive year, the College's standard for research productivity, which was having at least two refereed

publications a year.  *Unfortunately, the Defendant somehow forgot to mention that this occurred during Covid, and the requirement had been waived for both years.*

11. In the first full paragraph on page 14 of the Defendant's motion for summary judgment defendant:

a)      Despite having admitted that Plaintiff officially notified the Defendant of Plaintiff's charge of discrimination on September 24, 2019, the Defendant again makes the demonstrably incorrect claim that the Plaintiff never filed a complaint with UF Human Resources ("UFHR") or any other appropriate party at UF alleging discrimination.

12. In i on page 22 of the Defendant's motion for summary judgment defendant claims that the Plaintiff cannot establish a prima facie case of discrimination.

a)      The Defendant spends pages claiming that no one act is sufficient to establish a prima facie case of discrimination.  *Fortunately for the Plaintiff she is about to list 8 things which when taken together more than establish not only a prima facie case of discrimination, but also establish that she was forced to endure a extremely hostile work environment and Constructive Discharge.*

## APOLOGY

I George Harth attorney for the Plaintiff would like to humbly apologize to this honorable Court for the unusual manner in which the reminder of this response in opposition to Defendant's Motion for Summary Judgment has been drafted. I attempted on many occasions to dissuade the Plaintiff, but she was adamant.

## INTRO TO THE PLAINTIFF'S NARRATIVE IN THE HOSTILE WORK ENVIRONMENT AND CONSTRUCTIVE FRING SECTION

13. An action is adverse for purposes of Title VII's antidiscrimination clause where there is a "serious and material change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001). It could be argued that standing alone, some of the defendant's actions may not rise to the level of a serious and material change in the terms, conditions, or privileges of employment. However, as the Plaintiff's narrative in the Hostile Work Environment and Constructive Fring section of this response in opposition to Defendant's Motion for Summary Judgment shows when taken together with the negative performance review and information that she will not be promoted in the future, the weight of the Defendant's actions more than constitute both an adverse employment action and ample evidence for Constructive Fring.

14. To plead a prima facie case of Title VII retaliation, Plaintiff must allege "that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the two." Dixon v. Hallmark Cos., Inc., 627 F.3d 849, 856 (11th Cir. 2010). The causal link requirement is interpreted "broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." E.E.O.C. v. Reichhold Chemicals, Inc., 988 F.2d 1564, 1571–72 (11th Cir. 1993).

15. Defendant acknowledges that Plaintiff's September 2019 complaint to HR constitutes protected activity under Title VII. Therefore, there is no need to address causation with respect to filing of the EEOC charge.

16. Plaintiff's narrative in the Hostile Work Environment and Constructive Fring section of shows that after she notified HR that she believed she was being discriminated against based on her race and national origin, she was subjected to a collection of adverse actions that reached a level so intolerable that she was forced to resign.

17. Plaintiff also explains that both that the existing treatment worsened and that she was subjected to new negative treatment after her complaint, including "humiliating near constant, very public surveillance from her supervisor and an unsatisfactory rating on Research.

18. Further, Plaintiff explains that this change in treatment started in early 2020, shortly after her September 2019 HR complaint. Because of the temporal proximity, it is impossible to show that this worse treatment was "completely unrelated" to Plaintiff's HR complaint. See Reichhold Chemicals, Inc., 988 F.2d at 1571–72.

19. An employee has been constructively discharged when her employer "imposes working conditions that are so intolerable that a reasonable person in the employee's position would have been compelled to resign." Fitz v. Pugmire Lincoln Mercury, Inc., 348 F.3d 974, 977 (11th Cir. 2003) (internal quotation marks & alterations omitted).

20. However, as the Plaintiff's narrative in the Hostile Work Environment and Constructive Fring section of this response shows Plaintiff does state that her supervisor placed her under "near constant, very public surveillance" and further "intentionally embarrassed, harassed, and intimidated Plaintiff. Accepting these allegations as true, as it must, this Court finds that the complaint plausibly alleges a working environment which would compel a reasonable employee in Plaintiff's position to resign.

## HOSTILE WORK ENVIRONMENT AND CONSTRUCTIVE FIRING

21. Retaliatory Reassignment of Teaching Assignments: My teaching assignments were changed to much less desirable and more difficult to teach classes.

a)　In 2016, after being denied promotion, my teaching assignments were unjustly changed from a mix of undergraduate and graduate courses to solely undergraduate classes. This change significantly hindered my ability to work with graduate students—a crucial factor in the promotion process to full professor. Graduate teaching and mentorship are not only essential for academic growth but are also integral to research productivity and national recognition.

b)　Despite my successful history of mentoring over 70 graduate students, including four Ph.D. candidates, the reassignment limited my engagement with graduate students. Between 2016 and 2020, I was not assigned any new Ph.D. students, effectively stalling my professional advancement. Graduate advising and mentorship are explicit promotion criteria, and this reassignment directly undermined my ability to fulfill them.

c)　Despite this, I maintained satisfactory ratings in teaching, consistently improving my performance. Teaching research methods, a notoriously challenging subject in Public Relations, further demonstrates my commitment to excellence, even while my opportunities were being diminished by this retaliatory reassignment.

d)　Again, in 2016, after being denied promotion, I was predominantly assigned to teach two undergraduate research methods courses, which are widely recognized as challenging within my discipline. These courses are notably unpopular among communication students, making them particularly

difficult to teach effectively. This retaliatory reassignment was given to me without any clear rationale behind its decision.

22.(2) Retaliatory Increase in Service Load: My required service load was increased dramatically.

    a. After each promotion denial, my service load dramatically increased, well beyond the typical expectations for faculty members in the college, especially when compared to my white male colleagues. Following my 2014–2015 promotion denial, I was assigned to chair two major faculty search committees simultaneously in the 2017–2018 cycle—one for Public Relations and another for a joint search between Public Relations and Advertising. I was told by the department chair that this excessive service load would strengthen my promotion packet, but it placed an undue burden on me compared to my peers.

    b. The situation worsened after my 2018–2019 denial, particularly when I began raising formal complaints of discrimination and unfair treatment during step 1 and 2 hearings before arbitration. My service load increased yet again, with appointments to the following committees:

    - Faculty Advisor, Asian Public Relations Student Association (Spring 2019 – Spring 2021)

    - Inclusion, Diversity, Equity, and Accessibility (IDEA) Committee (Spring 2020 – May 2021)

    - Department Bylaws Review Committee (Chair, Fall 2020 – May 2021)

    - Sustained Performance Evaluation Committee (Fall 2019 – 2021)

    - Tenure and Promotion Committee (2017 – 2019)

- Undergraduate Scholarship Committee (2017 – 2018)
- University Faculty Senate (Fall 2019 – May 2021)
- Academic Assessment Council (appointed by Provost, Fall 2020 – May 2021)
- Ad Hoc Senate Officer Committee (appointed by Senate Chair, Spring 2021 – May 2021)

c. In addition to these university committees, I was expected to maintain a high level of national service to satisfy promotion criteria. During this period, I served on multiple journal editorial boards, held the role of Membership Chair for the faculty union (2019 – 2021), and served as President of the Korean American Communication Association (2019 – 2021).

23. Denial of Graduate Student Mentorship Opportunities: Defendant denied admittance to Ph.D. applicants for no reason other than the applicant expressed their interest in working with me.

a. Since joining the university, I have chaired and served on numerous graduate committees, mentoring over 50 graduate students. In my first year (2009–2010), I served on eight committees, chairing four of them. My reputation as a mentor attracted numerous inquiries from prospective students, many of whom expressed interest in working with me. The graduate division often forwarded applications to me when my name appeared as a potential advisor.

b. However, following my 2014–2015 promotion denial, the number of review requests from the graduate division drastically decreased. From 2016 to 2020, no new Ph.D. students were admitted working with me, severely limiting my ability to engage with graduate students and impacting my academic development.

c. In 2020, I reached out to Ms. Sarah Lee (Ann Grimmage), the college's admissions specialist, to inquire whether applicants were still expressing interest in working with me. She confirmed that several applicants had indeed named me as their potential advisor. Despite this, from 2016 to 2020, no new students were admitted under my mentorship, except for one student who declined the offer.

24. Intentional Reassignment of Ph.D. Students: Defendant intentionally assigned Ph.D. students who expressed their interest in working with me to other faculty members.

   a. After expressing interest in working with me, several Ph.D. applicants were admitted to the college but were intentionally assigned to other faculty members whose research fields were completely unrelated to the students' stated goals. This redirection deprived me of valuable opportunities to mentor graduate students and further develop my research and teaching credentials.

   b. One specific example is Julia Kim. I was asked to review her application and strongly recommended her admission to the Public Relations program, which aligned with both her interests and my expertise. Despite my recommendation, she was assigned to another professor in a different department whose research focus was entirely unrelated to her academic goals.

25. Defendant's Deliberate Limitation of Graduate Mentorship Opportunities: Defendant intentionally limited my opportunities to work with and mentor graduate students.

   a. Starting in 2016, following my first promotion denial, the Defendant intentionally restricted my ability to work with and mentor graduate students. My teaching assignment was altered to only include two

undergraduate courses, and I was not permitted to admit or advise any Ph.D. candidates. This deliberate change severely limited my opportunities to engage in graduate mentorship, a critical component of my academic role.

b. Mentoring Ph.D. students is not only vital to teaching and service but is also crucial for building collaborative scholarship and enhancing my national research profile. Graduate mentorship, particularly at the Ph.D. level, is explicitly listed as an essential factor for promotion to full professor. By denying me these opportunities, the Defendant significantly undermined my ability to meet the promotion criteria and continue my academic development.

26. Humiliating and Public Surveillance by Supervisor: I was under humiliating near constant, very public surveillance from my direct supervisor.

a. I was subjected to near-constant and humiliating public surveillance by my direct supervisor. The department chair played a central role in this harassment, starting with a letter of counseling that falsely accused me of unethical conduct. This letter was handed to me during a meeting with the dean and associate dean to discuss my promotion. These baseless accusations were later used by the dean as grounds to deny my promotion in 2019.

b. Following this, the chair repeatedly denied my requests for research support, the promotion of my faculty research award, and online teaching opportunities. Furthermore, my efforts to clear my name from these unfounded accusations were systematically blocked. I requested that the letter of counseling be removed from my personnel file, as the allegations were false. However, the chair maliciously kept the letter in

my file, tarnishing my reputation and further complicating any future promotion opportunities at the University of Florida.

c. After then, the chair has consistently denied my requests for research support, promotion of my faculty research award, online-teaching request, and any due process to clear my name from the accusations.

d. The harassment escalated to trivial matters, such as being reprimanded for spending $50 on a poster that won an award for best poster at the AEJMC conference, one of the largest conferences in the field. Rather than recognizing this achievement, the chair chose to focus on the minimal expenditure, which was unprecedented in my two decades of academic experience.

27.(7) Unfair Unsatisfactory Rating on Research During the COVID-19 Pandemic: I received the first unsatisfactory rating on Research in my annual evaluation during the Covid-19 pandemic.

a) In the 2020–2021 academic year, I received my first unsatisfactory rating in research. This evaluation occurred during an exceptionally challenging time due to the COVID-19 pandemic, when faculty were suddenly required to move all instructional activities online without preparation. On March 16, 2020, we were instructed to teach remotely, and throughout the academic year, faculty voiced concerns about the pandemic's impact on both teaching and research performance.

b) University operations were severely disrupted, including the Institutional Review Board (IRB) process, which directly hindered my research efforts. Recognizing these challenges, the university advised faculty to include a statement in our self-assessments regarding the extraordinary circumstances of the pandemic. The university had agreed with the faculty

union to consider these factors during performance reviews. I followed this guidance and included an explanation in my annual review.

c) Despite these circumstances, I was given an unsatisfactory rating. Additionally, my request to teach fully online during the pandemic was denied, even though other white professors were allowed to teach online. I was forced to teach hybrid courses, further increasing my workload, especially considering my already substantial service obligations at the departmental, college, and university levels.

d) This unsatisfactory rating was issued by the same department chair who had previously made unfounded accusations against me. It was clear that this rating was part of a pattern intended to sabotage my chances of future promotion, making it nearly impossible for me to advance at the University of Florida or to seek opportunities elsewhere.

28. (8) Unwritten Denial of Future Promotion Attempts: I was unofficially made aware that none of my future promotion attempts would be successful.

a) False Accusations Used to Deny Promotion: In 2014, Dean Diane McFarlin strongly endorsed my promotion, acknowledging that I had met the criteria for promotion to full professor. However, in 2019, she reversed her stance and authored a damning letter, using false accusations as the basis for denying my promotion. This was despite my significant academic achievements since 2014, including 14 additional refereed publications and improved teaching evaluations, all while managing an increased service load, such as chairing two faculty search committees simultaneously.

b) Application of Different Standards Based on National Origin and Gender: Provost Joe Glover denied my promotion on all three occasions, including the most recent case in 2021–2022, which was ordered by the

arbitrator. During the arbitration, Provost Glover testified that I had not received a national grant, which he claimed was necessary for promotion. However, this requirement was never applied to white male faculty members in previous promotion cases at the full professor level. The university has systematically applied higher and arbitrary standards to minority faculty, particularly to vulnerable groups such as Korean women professors, who are less likely to challenge these discriminatory practices.

c)      Disparities in Promotion for Minority Faculty at the College of Journalism and Communications: At the College of Journalism and Communications between 2018 and 2019, there were 13 associate professors and 14 full professors. Of the associate professors, 61.5% were white, while 38.5% were minorities, including myself as a Korean American woman professor. On average, minority faculty remain at the associate professor rank for 13.4 years, compared to 7.25 years for white faculty members. Additionally, a significant salary gap exists, with white professors earning an average of $95,417 compared to $86,418 for minority professors. At the full professor level, only 14% were minorities, and 80% were white. No Korean woman full professors have ever been promoted within the college, highlighting the systemic barriers faced by minority woman faculty.

d)      Between 2021 and 2022, the University of Florida had a total of 21 Korean women faculty members, including 1 full professor, 4 associate professors, 14 assistant professors, 1 lecturer, and 1 visiting lecturer. Notably, no Korean woman faculty member has been promoted to the rank of full professor at the university. The only Korean woman holding a full professorship was hired at that rank from another institution, rather than being promoted internally.

# PERSONAL STATEMENT

29. I joined the University of Florida in 2009 as an associate professor in the Department of Public Relations and worked there until I was forced to resign in the summer of 2021. During my tenure, I applied for full professorship three times—during the 2013–2014, 2014–2015, and 2018–2019 academic years—without success. Despite my efforts, the 2022–2023 case represents yet another promotion denial.

30. By the end of 2018, I had produced over 40 academic publications, mostly in top-tier journals, and secured more than 10 research grants. My performance was consistently strong, as evidenced by positive annual reviews from four different department chairs. I taught almost 40 graduate and undergraduate classes and mentored more than 55 graduate students, including four doctoral students. My promotion applications were endorsed by 15 external expert reviewers and received nearly unanimous support from full professors within the department and other colleagues across the college. However, despite these achievements, each promotion attempt was either discouraged or denied without clear reasons or guidance for improvement. Meanwhile, the university promoted less qualified white male professors, such as Prof. Ted Spiker, and hired other white male professors as full professors despite their having fewer academic credentials or national grants. The university not only systematically blocked my promotion but also retaliated against me after I filed complaints about discriminatory treatment. My service load was dramatically increased, arbitrary and capricious standards were applied to my promotion evaluations, and my teaching and service assignments were altered to overburden me. Furthermore, false

accusations were fabricated to damage my academic credentials and professional reputation.

31. By July 2021, when I received my first unsatisfactory rating in research, it became clear that I had no realistic chance of promotion. It was also apparent that I needed to prepare for potential dismissal, as I was being subjected to more false accusations and likely future denials—based not on my work but on my identity as a Korean American woman professor who had immigrated from Korea in 1993. The university targeted me because they likely believed I would be less inclined to formally challenge their discriminatory conduct and would not be familiar with how to file a complaint.

32. For many years, I believed that the university would follow clear procedures based on the written promotion criteria specific to my discipline. However, the university not only failed to provide a fair review but also continuously retaliated against me for speaking out against the unfair treatment.

**CONCLUSION** Based on the above, there are genuine issues of material fact, and a reasonable jury could return a verdict in Plaintiff's favor on any or all of her claims.

**WHEREFORE**, for the reasons stated above, Plaintiff humbly requests that this Honorable Court enter an Order denying the Defendant's Motion for Summary Judgment.

Respectfully submitted this 10[h] day of September 2024.

/s/ George E. Harth, Esquire
George E. Harth, Esquire
P. O. Box 111
Micanopy, FL 32667
Email: gharth@harth-law.com

**WORD COUNT CERTIFICATION**

This document complies with word limits set forth in N.D. Fla. Local Rule 7.1(F), and contains 4,292 words, which includes the headings, footnotes, and quotations, but does not include the case style, signature block or Certificates of Word Count and Service.

> /s/ George E. Harth, Esquire
> George E. Harth, Esquire

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 10h day of September 2024, a true and correct copy of the foregoing was electronically filed in the US District Court, Northern District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

> s/George E. Harth, ESQUIRE
> GEORGE E. HARTH, ESQUIRE